CHICAGO, M. & ST. P. RY. CO. v. CITY OF TACOMA. *

(Circuit Court of Appeals, Ninth Circuit. August 24, 1925. Rehearing Denied October 12, 1925.)

No. 4502.

1. **Master and servant** ⬡⟳301(4)—**Railroad company held independent contractor in doing work for city.**

A railroad company, which undertook, for a consideration, to lift from a car with its wrecking crane and place in position at a city lighting plant, a transformer core weighing 34

*Certiorari denied 46 S. Ct. 119, 70 L. Ed. —.

tons, held to have done the work as an independent contractor and to be liable to the city for injury to the core through defective condition of the crane or negligence in operation by its employees.

2. **Master and servant** ⬡⟳301(4)—**Contractor liable for negligence of servants in performance of contract.**

One who agrees to do a completed work, with instrumentalities and servants over whom he retains control, is responsible for negligence in doing the work.

3. **Negligence** ⬡⟳20—**Failure to inspect machinery before use held negligence.**

A railroad company, which contracted to move with its wrecking crane a load which was to the full limit of its capacity, held liable for damage caused by failure of a brake to hold, on the ground that the brake, which had been in use for some years, was not properly inspected before the work was undertaken.

In Error to the District Court of the United States for the Southern Division of the Western District of Washington; Edward E. Cushman, Judge.

Action at law by the City of Tacoma against the Chicago, Milwaukee & St. Paul Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Geo. W. Korte, of Seattle, Wash., for plaintiff in error.

E. K. Murray, Leo Teats, and Lorenzo Dow, all of Tacoma, Wash., for defendant in error.

Before GILBERT, HUNT, and RUDKIN, Circuit Judges.

HUNT, Circuit Judge. The city of Tacoma recovered judgment against the railway company for damages done to a large transformer core which the city purchased for use in its municipal lighting plant. The complaint alleged that the city and the railway company made an oral contract, confirmed by requisition, whereby the railway company agreed for a valuable consideration to lift with its crane and crew the transformer core, which weighed about 34 tons, from aboard a car, and put it in the tank therefor on the ground or platform beside the car at the substation of the city's lighting plant at Tacoma; that the railway company picked up the transformer core with its crane to put it in the tank, and, while the core was suspended about 6 feet in the air over the end of the car, through negligence and carelessness in entering upon the performance of the contract with a defective crane, and through the negligence and carelessness of its agents in operating the crane and brakes,

permitted the core to drop against the end of the car and damaged the core. The railway company denied all damage.

The trial court found that the parties entered into the oral agreement as alleged; that defendant, through its negligence in entering upon the performance of the contract with an insufficient crane, or through the negligence and carelessness of its agents in operating the crane and the brakes thereof, allowed the transformer core to drop against the end of the car, and so caused the damage.

The evidence of the city was to this effect: After some preliminary conversations, the employees of the city and Wilson, foreman of the wrecking crew of the railway company, went together to where the cars were and examined the general situation. In the course of their conversation, the city's agents said that they had heard that $15 per hour was what had been charged for the use of the crane on other occasions, and the railway company's foreman said it was not quite that much, but he did not know how much it would be. Wilson was told that the core weighed 34 tons and how high it would have to be lifted. He said the work could be done, and referred the representatives of the city to Mr. Dow, division superintendent of the railway company. The city's employees went to Dow's office, where they were told the crane was available and that a confirmatory requisition was necessary. Accordingly, requisition for "use of crane unloading transformers on municipal street railway line" was sent. The next morning the wrecking crew was at the substation with the crane. The city's lighting engineer was also there with several men. The company's crew unloaded the case and put it on some trucks on the ground. They then hooked onto the core and raised it, preparatory to swinging it over and placing it in the case. Wilson, foreman of the wrecking crew, had charge of operations and gave the orders. The core was raised about 5 feet above the floor of the car, but it was found not to be high enough by 31 inches, to allow it to enter the case. After a conference among the respective parties, it was decided to lower the case by taking the trucks from underneath it. Meanwhile the crane held the core suspended.

Kent, construction foreman for the city, testified: "Mr. Wilson asked me what we would do about it, and I said, 'Well, I guess we would have to set the tank down into a hole in the ground, dig a hole in order to get this 31 inches'; so he was going to pick the case up and set it aside so we could dig under it, and, in order to do that he had to lay the core down again, and he motioned the crane operator to lay the core down again, and it dropped. The underside of the transformer core hit the end of the flat car and bent the top of the iron frame of the flat car around so it bent down on the side and the other end came clear off the truck." The crane crew then lifted the core up and put it down on some blocking on the ground.

Upon that showing plaintiff rested, and defendant introduced its testimony to the effect that, before undertaking the work, the hoisting engineer, who operated the crane, tested the brake by taking off the clutch, setting the brake, and putting on all the power behind the engine to see if the drum would turn over, and that such a test is the usual and ordinary one. There was no inspection by tapping to ascertain whether any rivets were loose, or by dismantling to see the condition of the band and drum. The engineer said he lifted the core, raising the boom to the extreme height it would go; that upon a signal from the foreman he started to lower the load; that he did this by starting the boom down until the load was about 4½ feet over the car; that he was then ordered to stop; that he did so, and held the load with the hand brake, the purpose being to lower the boom. To lower the boom the operator had to use a separate clutch, and while he was changing the clutch to operate the boom the hand brake was used to hold the load. He put on the boom clutch and started to lower the boom, but after it had been lowered about a foot the transformer core dropped. His testimony was that, as the load or line slipped on the drum, he noticed sparks coming from the brake drum between the band and the drum; that after the core dropped the crane picked it up and set it on the ground; that at that time he lowered the core with steam and the hand brake, but "just slackened the brake a little bit and used the steam—worked it down on compression." Afterwards the hand brake was dismantled and a broken rivet was found, and marks on the wooden brake lining showed where a rivet had been rolled up between the lining and the steel brake drum. There was a ragged mark in the wooden lining 5 or 6 inches long, and at the hole directly under the scoring there was a rivet missing, and the drum itself showed scoring in the center all the way around.

An experienced machinist called by the railway company testified that it appeared to him that when the rivit left its natural position it took the braking power away from the brake band, and that, as far as he knew, that brake band had been on the crane since 1916. Wilson, the foreman of the wrecking crew, testified that Kent, in behalf of the city, directed the swinging of the core over next to the case; that after it was swung back, in order to lower the boom, the engineer slackened his head line, and, as it started down, it dropped; that he saw the engineer operating the machinery; that when the load slipped he saw sparks coming out of the hand brake. It appeared that the crane had a maximum capacity to lift and lower a load not exceeding 34 tons. Defendant's motion for judgment was denied.

[1, 2] The first question presented is whether the city borrowed the crane and crew to do its own work, or whether the railway company made an independent contract. Taking the case as developed by the evidence of both sides, we conclude that the foreman of the wrecking crew and the men making up the crew were all servants of the railway company, and that the company, with knowledge of the weight of the core, acting through Dow, superintendent, agreed, for a consideration to be paid it, to unload the case and core at the point where the city wished it to be placed. The company had sole power to control and direct its servants in doing the work, and it exercised that power. The conference had while the core was suspended at the highest point to which it could be raised was to decide what was the best practical way to meet the situation that had presented itself. The suggestion to dig under the core to lower it was the solution, and the expectation that the servants of the city would do the digging was in cooperation necessary upon taking the actual measurements while the core was suspended. However, in the undertaking of lifting the core there was no changed relationship between the parties; nor was there any authoritative direction and control exercised by the agents of the city. We must regard the agreement as within the rule that one who agrees to do a completed work with instrumentalities and servants over whom he retains control is responsible for negligence, because, though the work is done for the ultimate benefit of another, in performance the contractor is doing his own work. Standard Oil Co. v. Anderson, 212 U. S. 215, 29 S. Ct. 252, 53 L. Ed. 480.

[3] The next inquiry pertains to the cause of the failure of the brake to hold. If the machinery was capable of lifting the load and swinging it into place, and the brake was in good order to do the work, but the engineer failed to control the brake and to hold the core, and by any slackening or release of his hold the brake started to slip and gained headway which tore away the brake lining and rivets, then clearly the lack of skillful operation by the servant would make the railway company liable. But we think that, inasmuch as the evidence makes it doubtful whether the engineer did loosen his hold on the brake, and that the core fell because of any negligence on his part, we can put aside that phase of the case, and consider the evidence as presenting only the question, whether the railway company made such an examination of the machinery as it should have before it undertook the work.

The company, charged with knowledge that the brake had been in use for years, and that, after long use of such a machine, the rivets which held the brake band to the steel band not infrequently work loose and thus weaken the braking power, failed to make a careful inspection of the brake before subjecting it to a strain of 34 tons weight, the maximum capacity of the machine. If the evidence had tended to show that the brake had been taken apart and examined shortly before the accident, or that it had been subjected to any recent reasonably careful inspection, it might be said that the test which the engineer made was sufficient. But in the light of the testimony that the only way to make a careful inspection was by hammer tapping or taking the band off, and that neither of those things was done, the conclusion is unavoidable that there was a failure on the part of the company to make a proper inspection, and that it was negligent in not doing so.

We find no error, and affirm the judgment.